UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ADEBOWALE ADENEKAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Cause No. 1:10-cv-1668-WTL-DML |
| | ) |
| ELI LILLY & COMPANY, | ) |
| | ) |
| Defendant. | ) |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on the Defendant's motion for summary judgment (docket # 52). The motion is fully briefed, and the Court, being duly advised, **GRANTS IN PART** and **DENIES IN PART** the motion for the reasons and to the extent set forth below.

**I. STANDARD**

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not

required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. <u>FACTUAL BACKGROUND</u>

The relevant facts of record, viewed in the light most favorable to the Plaintiff, are as follow.[1] Defendant Eli Lilly and Company ("Lilly") hired Plaintiff Adebowale Adenekan in October 2003 as a Senior Analytical Chemist in the equipment validation unit of Lilly's Quality Control Department. In this position, Adenekan wrote, executed, and qualified "protocols." Lilly classified him as a Pay Level 54 employee.

From his hire in October 2003 to approximately February 2005, Alex Prokai ("Prokai") was Adenekan's supervisor. In Adenakan's 2003 performance evaluation completed on December 9, 2003, Prokai rated Adenekan as "satisfactory" in all seven categories, including "model the values, create external focus, anticipate changes and prepare for the future, implement with quality, speed and value, evaluate and act, achieve results with people, share key learning." He also marked Adenekan as eligible for a merit increase. In Adenekan's 2004 performance evaluation, also completed by Prokai, Adenekan received three "needs to develop" ratings, but he also received four "satisfactory" ratings and was rated eligible for a merit increase.

In late 2004 or early 2005, Adenekan learned that Lilly was eliminating his position and would give him sixteen weeks to find another one. Adenekan ultimately accepted a position as a third (night) shift "bench chemist" performing testing in the BHI "in-process" laboratory in

---

[1] Large sections of Lilly's statement of facts are undisputed, so the Court has adopted Lilly's statement where appropriate.

2

the Quality Control Department, reporting to supervisor Michael Krivan. While Adenekan considered himself over-qualified for the position, his compensation remained the same. As a bench chemist, Adenekan operated at a higher technical level than the handful of lower-paid technicians (or analysts) who ran the day-to-day sample analysis in the laboratory. According to one of Adenekan's later supervisors, Jeff Streveler, bench chemists at Lilly were expected to have far fewer errors than laboratory analysts. Adenekan did perform some of the duties of lower-paid technicians or analysts, but he also mentored or guided analysts. In addition to performing his own testing duties, Adenekan served as a technical resource for the department, overseeing the implementation of procedures by the technicians, developing new method protocols, and troubleshooting instrument and laboratory issues.

During Adenekan's 2005 review, Krivan rated him successful in four leadership behaviors and needing improvement in three. The review, which Adenekan agrees with, noted: "[A] greater emphasis must be placed on a sense of urgency with samples, instrument turn around, and incorporating management feedback[;] Must increase his ability to self manage his performance and aisle[;] Debo must complete deviations independently[;] Needs to make sure that the attention to detail is present to eliminate items such as duplicate injections and expired mobile phase."

In early 2006, the management of the Quality Control Laboratory changed. Jeff Streveler became leader for the night shift and Miriam Alzoobaee became leader for the day shift. At this time, two other bench chemists worked in the laboratory and three or four analysts worked on each shift.

Adenekan had trouble working with one of the technicians, Amy Doyle. Adenekan alleges that on one occasion in early April 2006, as he tried to explain something about the laboratory equipment to Doyle, she said, "You dumb ass nigger. What do you know?" Adenekan, who is of Nigerian descent, was greatly distressed by Doyle's comment and considered leaving work for the day. Streveler was standing near Adenekan and Doyle at the time of the comment and heard her use the term "dumb ass," but did not hear the racial term alleged.[2] When Adenekan expressed his surprise at her comment to Streveler, asking "Did you hear that?" Streveler replied that he did not think Doyle meant anything by it. Adenekan complained about Doyle to Streveler again later that day and Streveler told Adenekan that he would talk to her, but he again repeated that he did not think Doyle "meant anything" by her comment.[3] Streveler subsequently counseled Doyle on the inappropriateness of confrontations in the laboratory. Doyle was also placed at the first stage of Lilly's progressive discipline model, and she was temporarily barred from working or taking overtime on Adenekan's shift.

Dissatisfied with Streveler's response, Adenekan contacted Human Resources Representative Yvonne Brasker about the altercation with Doyle several days later, alleging that Doyle had called him a "dumb ass" during the incident. Brasker testified that Adenekan told her that he did not believe Doyle's actions toward him were based on race. Brasker replied that she

---

[2] Adenekan claims that Streveler heard this comment at the time it was made, but he has provided no basis for his knowledge about what Streveler heard. Adenekan also argues that he later complained to Streveler about Doyle's use of a racial epithet, but this statement lacks evidentiary support. Pl's Resp. in Opp. to Def.'s Mot. for Summ. J. 8, April 27, 2012, ECF No. 56.

[3] It is unclear from Adenekan's testimony whether he told Streveler that Doyle had used a racial slur when he later complained to Streveler about Doyle.

would look into the incident. Brasker investigated Adenekan's concerns and determined that Adenekan and Doyle had, in fact, had a confrontation in the laboratory where Doyle referred to him as a "dumbass"—for which Doyle was coached by her line management.

Two to three weeks later, Adenekan reported the alleged racial statement to Lilly's complaint hotline. Adenekan testified that this was the first time he reported the "racial incident." In response, another Lilly Human Resources representative interviewed Adenekan and told him Lilly would address the issue with Doyle. Brasker then contacted Adenekan about his request for a department-wide program to address work environment issues. Brasker initiated and oversaw department meetings with Adenekan's manager Khalid Mahmood,[4] Streveler, and Adenekan over a period of two to three months regarding Adenekan's ideas on how to improve the work environment; however, these meetings occurred infrequently, and when they did occur, attendance was weak – sometimes Brasker was not there and Streveler testified that he did not remember whether he attended any meetings. Moreover, the program was never completed. Not surprisingly, Adenekan did not find the meetings helpful.

On June 11, 2006, Streveler counseled Adenekan on June 11, 2006, about the need to complete all "deviation" reports before the end of his shift.[5] On June 29, 2006, Streveler issued a verbal warning to Adenekan on the basis that Adenekan had performed a laboratory test without

---

[4] Mahmood became "Team Leader" in the Quality Control Laboratory in May 2006.

[5] The FDA requires Lilly to document any "deviation," a variation from specified testing protocols, and does not permit Lilly to release any product affected by a deviation. Lilly thus requires that employees complete electronic laboratory investigation reports—an information-gathering process relating to the deviation incident that could take from two to three hours to complete—on each deviation before leaving for the day. Lilly then tracks all deviations in a database, which the FDA periodically reviews. As a laboratory leader, Streveler reviewed computerized records of his laboratory's deviations daily.

documentation that he had been trained to perform the test. However, Adenekan had completed the training and had submitted documentation to that effect, but for some reason, the documentation did not appear in Adenekan's file.

By November 2006, Adenekan had been involved in numerous deviations. According to Streveler, Adenekan's performance deficiencies included mishandling of samples, improper use of laboratory equipment or instrumentation, and inability to independently perform tasks expected of a laboratory employee of his pay grade level. Streveler raised these performance concerns with Mahmood and Brasker, and on November 17, 2006, Mahmood and Brasker delivered a written warning to Adenekan for unacceptable work performance. The warning noted numerous deviations caused by Adenekan. For example:

- on August 28, 2006, "the lab received four samples with the first one received at 1932 and the last received at 0243. These samples were not started until 0426, delaying release by many hours into the next shift";
- on October 9, 2006, Adenekan verified that "instrument 46 was suitable to run samples by signing as the second person verifier (SPV)"[6] though the instrument had a "Do Not Use" tag on it. "All results generated on [the] instrument were considered suspect until the RQ testing was performed and passed on instrument 46";

---

[6] "Second person verification" ("SPV") refers to the second-person review of all testing performed by the laboratory before results are released.

- on October 17, 2006, Adenekan failed to follow a procedure described on a training form he signed for second-person verifying the correct dilution of a sample, and on November 13, he incorrectly set up a sample set;

- on October 27, 2006, Adenekan "delayed the release of a zinc chloride sample by over three hours the sample was received in the lab at 0244 and was not released until 0723. This sample has a 45 min turn around time it took over 4hrs to release this sample"; and

- on October 27, 2006, "the BHI aisle was left with only one suitable instrument out of the five available for this aisle because you had not completed system suitability on the other instruments. This delayed turn around time by about 12 hours."[7]

The written warning concluded that Adenekan must "[s]how immediate and sustainable improvement in paying attention to detail to avoid analyst related deviation and following lab procedures," and that "[f]ailure to meet these expectations and sustain acceptable performance and conduct may lead to further disciplinary action, which may include probation or separation."

Based on Adenekan's continuing performance issues, at the end of 2006, Streveler concluded that Adenekan was performing at an unsuccessful level. Adenekan's 2006 review rated him unsatisfactory in four leadership behaviors and "need[ing] improvement" in three

---

[7] The severity of a deviation varies based on the impact to the product. Thus, deviations that were caught before the product sample left the laboratory were viewed as less severe than those where the product was released from the laboratory (upon completion of the second-person verification process). While deviations could range from insignificant to significant, Mahmood testified that SPV deviations would be considered severe. In Lilly's view, such errors—including for example, the failure to note a "Do Not Use" tag by a second-person-verifier—are worse than simply committing the initial error.

more. In his deposition, Streveler further explained that Adenekan did not meet Lilly's expectation that chemists "should be able to run samples, write deviations, write protocols with no supervision [and] mentor analysts in the laboratory." Because Streveler had rated Adenekan's performance in 2006 as unsuccessful, Adenekan was ineligible for a merit increase or the Lilly bonus program in 2007.

At his request, Lilly transferred Adenekan to the day shift in late 2006[8] to further separate him from Doyle. He worked under the supervision of Alzoobaee and later Rob Fleeger. However, Doyle was later allowed to work overtime during Adenekan's shift over Brasker's objections. An email string between Streveler and Brasker about whether Doyle could work overtime on Adenekan's shift includes an email authored by Brasker in which Brasker "strongly recommend[s] against" permitting the two to work the same shift and explains that Lilly has "committed to keeping them separate for now." Adenekan testified that overall he and Doyle worked together about sixty percent of the time.

Adenekan took leave for a family issue from January 26 to March 5, 2007. Upon returning, Adenekan continued to be involved in serious deviations in the laboratory. On July 2, 2007, Mahmood notified Adenekan in writing that Lilly was placing him on a six-month probation based on his failure to meet the minimal performance expectations set out in his

---

[8] There is considerable disagreement about whether Adenekan was transferred in late 2006 or late 2007. Brasker and Streveler testified that Adenekan was transferred to the day shift in August 2007, which would seem to be consistent with Streveler's participation in Adenekan's 2006 performance review as well as his participation in drafting the November 17, 2006, probation letter to Adenekan. However, Adenekan asserts that he was transferred in late 2006, which would seem to be consistent with an email from Streveler to Brasker in December 2006, inquiring whether Brasker would be okay with Doyle covering overtime "on the other shift" with Debo. For purposes of summary judgment, the Court is obligated to resolve this dispute in favor of Adenekan.

warning letter of November 17. This probation notice recited further examples of performance deficiencies, including, for example:

> On March 13, 2007 you entered a wrong result for item code QA 103L, Sample ID LCP4V30.[9]
>
> On March 16, 2007 you modified the HPSS template used by the laboratory. As a result the QS4328, Batch # 311277 was injected twice and a deviation "BFC-004951- DEV" occurred.
>
> On June 08, 2007 you second person verified and released in Admin/Lims the wrong results for item codes QA378T, batch #A352469, and item codes QS4355, batch # A348916. These results were pulled back from ADMIN/LIMS for correction and a SARE # 1022169 occurred. As a second person verifier you should have ensured result accuracy prior to release.
>
> On June 08, 2007 you second person verified and released the results in Admin/Lims for four samples. Those were run on expired system suitability . . . and the sample results had to be invalidated and were also documented. As the second person verifier and then, as the analyst, you should have ensured that samples are tested on valid systems only.

The letter concluded: "During this probationary period, your performance must be considered acceptable or you will be subject to immediate dismissal. . . . In addition, you will not be eligible for a merit increase or promotional consideration at the next available merit increase cycle date in March, 2008."

In November 2007, Adenekan met with Mahmood's supervisor, Manager Jeff Hines, to discuss his performance issues. During the meeting, Adenekan insisted that his performance could not be equated with the number of deviations he had caused, attributing the treatment of

---

[9] Adenekan speculates that this error occurred when another technician entered the erroneous data under Adenekan's username unbeknownst to Adenekan. Adenekan testified that it is inconsistent with Lilly policy to let someone else input data under one's name.

his deviations to the hotline call he placed about Doyle. He declined the offer of additional training on procedures.

On November 8, 2007, Brasker emailed plant manager Charles Fisher, Hines, and Mahmood to advise them of the status of several employees with performance problems, including Adenekan. Brasker noted that Adenekan had shown "some improvement" but would be warned that "significant improvement" was necessary to meet the terms of his probation. In the final weeks of 2007, Adenekan failed to demonstrate any such improvement. His final 2007 review, completed by Alzoobaee in mid-December, provided that

> Debo is still unable to perform at the 54 level expectations. He has not demonstrated his abilities to perform his tasks independently. He has been unable to complete and manage his PM plan effectively and timely. He does not communicate with his supervision in an effective and timely fashion even though he was coached on how and when to ask for help. He has not been able to acquire a deep knowledge of the instrumentation and methods for his area of responsibility. He has not demonstrated his ability to understand and improve the processes of his area. He has not demonstrated his ability to solve complex issues on his own. He has not demonstrated his leadership abilities to influence or coach. He has not demonstrated decisive decision making when working on projects. He has not demonstrated the effort to form a plan to effectively grow and develop as a technical leader. He has not met the criteria of his probation.

Adenekan received five "unsatisfactory" ratings on leadership behaviors and two ratings of "needs improvement." He was not deemed eligible for a merit pay increase. According to Adenekan, this review did not mention positive contributions he had made, including solving problems related to an instrument.

Ultimately, Lilly terminated Adenekan's employment in December 2007 because he had failed to improve his performance. The decision process involved input from supervisor Rob Fleeger, Mahmood, and Mahmood's superior Jeffrey Hines, as well as the Human Resources Department. Streveler, who no longer supervised him, did not participate in the decision to

discharge Adenekan. On December 20, 2010, Adenekan filed the instant action against Eli Lilly, alleging violations of 42 U.S.C. § 1981.

### III. DISCUSSION

Adenekan asserts claims for race discrimination with respect to a hostile working environment and disparate pay, discipline, and discharge under 42 U.S.C. § 1981.[10] Section 1981 provides that "[a]ll persons . . . shall have the same right . . . to the full and equal benefit of all laws . . . as is enjoyed by white citizens." In analyzing claims of discrimination under §1981, courts use the same analysis that is used for Title VII cases. *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 338 (7th Cir. 2002). Lilly has moved for summary judgment on all claims in Adenekan's Complaint; each is addressed below.

### A. Admissibility of Exhibit G

As a preliminary matter, the Court must address the admissibility of a document on which Adenekan bases much of his argument about the hostile work environment at Lilly. Adenekan asserts that this "Exhibit G," entitled "Documentation of recent incidents," records specific harassing events suffered by Adenekan at the hands of Doyle. These incidents allegedly occurred in early November 2006. Adenekan drafted this document on November 12, 2006, thereafter sending the letter to Streveler on November 13, 2006.[11]

The Defendant asserts that this evidence is inadmissible hearsay and thus may not be considered by the Court. In response, Adenekan argues that Exhibit G is admissible in two ways:

---

[10] Adenekan has abandoned his claims for disparate demotion and disparate promotion. Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J. 9 n.7, April 27, 2012, ECF No. 56.

[11] Streveler then forwarded the letter to Brasker and Mahmood.

(1) as a recorded recollection under Federal Rule of Evidence 803(5); and (2) to establish that Adenekan reported Doyle's harassing behavior to Lilly. The Court finds that the evidence in Exhibit G is properly before it, but not because it is a recorded recollection.

Evidence offered in opposition to summary judgment need not be admissible as to form; it must simply be admissible as to content. *Stinnett v. Iron Works Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002). For example, while affidavits are not ordinarily admissible evidence at trial, an affidavit or summary of testimony may be considered at the summary judgment stage if a substitution of oral testimony would make the content of the affidavit admissible at trial. *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267-68 (7th Cir. 1994). Here, Adenekan has provided an affidavit whereby he testifies that he is "prepared to testify under oath about the harassment" he documented in Exhibit G. He also attests to the accuracy of the document. In this way, Adenekan has effectively incorporated Exhibit G by reference into his affidavit. Thus, to the extent that Exhibit G is simply a summary of Adenekan's expected testimony at trial, it may properly be considered by the Court.

At the same time, Adenekan does suggest that to the extent that he is unable to testify to certain incidents of harassment because his memory has faded, he may introduce this exhibit to complete the story of the harassment he suffered. If Adenekan does seek to introduce the exhibit at trial to establish that the incidents described therein occurred, Exhibit G would indeed be hearsay and its admissibility would depend on whether it falls under a hearsay exception. Whether Exhibit G will be admissible – as a recorded recollection for example – at that point will depend on the foundation Adenekan's counsel has laid and will be addressed by the Court then.

Adenekan also argues that the report is admissible to establish that Lilly was on notice about Doyle's behavior because Adenekan gave this report to Streveler. Insofar as this proffer does not seek to establish the truth of the matter asserted, Exhibit G is not hearsay and is admissible.[12]

### B. Hostile Environment Claim

Adenekan argues that Doyle's behavior constitutes racial harassment and created a hostile work environment for which Lilly is liable. Hostile environment claims based on racial harassment are reviewed under the same standards as sexual harassment. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n.10 (2002). In order to prevail on a hostile work environment claim, the plaintiff must show that the conduct at issue "was both subjectively and objectively so severe or pervasive as to alter the conditions of employment and create an abusive working environment." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975 (7th Cir. 2004) (quotations omitted). "'[R]elatively isolated' instances of non-severe misconduct will not support a hostile environment claim." *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993).

To get past summary judgment on a hostile work environment claim, Adenekan must provide sufficient evidence to create a material issue of fact as to four elements: (1) the work environment was both subjectively and objectively offensive; (2) his race was the basis for the

---

[12] The Defendant also takes issue with Exhibit G because, it contends, Exhibit G lacks sufficient authentication. To the extent that authentication is still required for summary judgment exhibits under Rule 56 as amended in 2010, Adenekan has authenticated the document. Pl.'s Surreply, Ex. A, May 30, 2012, ECF No. 63-1.

harassment; (3) the conduct was severe or pervasive; and (4) there is a basis for the employer's liability. *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010).

> We do not focus on discrete acts of individual employees when evaluating a hostile work environment claim, but must consider the entire context of the workplace. To support a hostile work environment claim, the plaintiff need not show that the complained-of conduct was explicitly racial, but must show it had a racial character or purpose.

*Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011) (citations omitted).

In this case, Adenekan alleges that Doyle created a hostile work environment when she called him a "dumb ass nigger," shouted at him, referenced the fact that Adenekan was a chemist in a derogatory manner, made disparaging remarks about his salary, used inappropriate language and curse words to and about him, and discussed Adenekan's HR complaint in a negative manner in front of other employees. The evidence establishes that Adenekan found it so difficult to work in the environment Doyle created that he requested to be moved to a different shift and asked Human Resources to create a program to deal with the issues. As to the first and third prongs, the Court has little trouble concluding that a reasonable jury could find that this behavior constituted offensive behavior that was severe and/or pervasive.

With respect to the second prong, the racial basis for harassment, it is true that Doyle is only alleged to have made one explicitly race-based derogatory comment to Adenekan. However, Doyle's other statements to Adenekan that he was "dumb" must be viewed in the context of this race-based comment. When viewed in this light, Doyle's other comments may indeed take on racial overtones. In addition, incidents that involve other members of the protected class are relevant to the hostile work environment analysis. *E.g.*, *Yancick*, 653 F.3d at 545. Adenekan testified that Doyle also called her African-American coworkers dumb, ordered

14

them around, and called them different names than she used when addressing non-African-Americans. When combined with Doyle's one racially derogatory statement toward Adenekan, the evidence about Doyle's other statements to Adenekan and her treatment of African-American coworkers could lead a reasonable jury to conclude that Doyle's treatment of Adenekan was based on his race.

Finally, Adenekan must demonstrate a legal basis for holding Lilly, as employer, liable for the behavior of its employee, Doyle. An employer is not automatically liable for harassing behavior by coworkers; rather, employers are only liable where they do not "promptly and adequately respond to employee harassment." *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 994 (7th Cir. 2011) (explaining employer liability under Title VII). While "not every preventive measure will be a proper remedy . . . [t]he question is instead whether [the employer's] response to the harassment was a reasonable one, designed to remedy the illegal harassment, or a negligent one that did not adequately respond to the situation in its midst." *Smith v. Sheahan*, 189 F.3d 529, 535 (7th Cir. 1999). However, "what is reasonable depends on the gravity of the harassment." *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 432 (7th Cir. 1995).

Lilly argues that it took the following steps to remedy the situation between Doyle and Adenekan: Streveler verbally counseled Doyle about the inappropriateness of workplace confrontations; Lilly barred Doyle from working or taking overtime on Adenekan's night shift; Lilly moved Adenekan to the day shift after Doyle began working overtime on the night shift; and Brasker instituted meetings between herself, Streveler, and Adenekan to improve the workplace environment. According to Lilly, these steps are evidence that it responded promptly

and reasonably to Doyle's harassment of Adenekan. However, Adenekan has put forth evidence sufficient to convince a jury that these steps were not as reasonable as they may appear at first glance. Specifically, Adenekan has shown that Streveler never confirmed whether Doyle apologized; Doyle was soon permitted to work during Adenekan's shifts over Brasker's strong objection; and the process Brasker initiated to address workplace environment issues fell far short: meetings were infrequent, attendance at meetings that actually took place was weak, and the process was never completed. Thus, regardless of whether the measures Lilly took to address Doyle's behavior would be reasonable if implemented properly, the fact that each of these responses was poorly implemented in practice could be enough to convince a jury that Lilly did not reasonably respond to Doyle's behavior.

### C. Discriminatory Pay, Discipline, and Discharge

Adenekan also brings a claim of disparate pay, discipline, and discharge under § 1981, alleging that he was denied merit pay and was disciplined and ultimately discharged when other similarly situated coworkers were not. Plaintiffs alleging discrimination under § 1981 may prove such discrimination using either a direct or indirect method of proof. *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 849-50 (7th Cir. 2008). The direct method requires that the plaintiff produce evidence that the defendant was motivated by animus toward a protected class when he suffered some adverse employment action. *Id.* If a plaintiff cannot present direct evidence of discrimination, he may pursue his claim using indirect evidence. To show a prima facie case under the indirect method, the plaintiff must show (1) he is a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered some adverse employment action; and (4) other similarly-situated employees not in the same

class were treated more favorably. *Id.* Adenekan argues that he has made out a prima facie case of discrimination under the indirect method, but even assuming for the purposes of this analysis that Adenekan can satisfy the first three elements of his disparate treatment claim, his claim nevertheless fails on the fourth prong.

"Whether a comparator is similarly situated is usually a question for the fact-finder, and summary judgment is appropriate only when no reasonable fact-finder could find that the plaintiffs have met their burden on the issue." *Coleman v. Donahoe*, 667 F.3d 835, 846-47 (7th Cir. 2012) (citations omitted). "Which factors are material is a case-specific inquiry that depends on the specifics of the defendant's decision and the stated reason for it." *Good v. Univ. of Chicago Med. Ctr.*, 673 F.3d 670, 675-76 (7th Cir. 2012). However, "[i]n the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."*Coleman*, 667 F.3d at 847 (citations omitted). "Formal job titles or rank are not dispositive;" rather, the key inquiry is whether the comparators were subject to the same standards or rules. *Rodgers v. White*, 657 F.3d 511, 518 (7th Cir. 2011) (comparing employee and supervisor where both were accused of allowing abuse of state property and improperly recording overtime); *Coleman*, 667 F.3d at 848 (comparing coworkers who were disciplined for violating a "general workplace rule that applied to employees in all departments and of all ranks," and explaining that, in misconduct cases as opposed to performance cases, "comparison between employees with different positions are more likely to be useful").

Adenekan has identified three coworkers supervised by Streveler that he argues are similarly situated, but were treated more favorably: James Olsen, Lowell Finch, and Amy Doyle. While each of these employees worked as technicians or analysts, not bench chemists, the evidence establishes that analysts and bench chemists performed many of the same duties, including chemical testing, second-person verification, and instrument qualification. However, even though Adenekan and the alleged comparators performed similar functions, Adenekan's supervisor unequivocally testified that bench chemists were expected to have far fewer errors than analysts. This testimony is directly relevant to the reasons for Lilly's pay, discipline, and discharge decisions, all of which are predicated at least in part on Adenekan's errors in the lab. This testimony also clearly distinguishes Adenekan's asserted comparators with respect to a key aspect of the relative similarity between them – the number of errors they were expected to have – and thereby renders any comparison to them utterly meaningless. For this reason, no reasonable jury could find that Olsen, Finch, and Doyle were similarly situated. Having identified no other comparators, Adenekan fails to show similarly situated coworkers who were more favorably treated, and his claims for disparate pay, discipline, and discharge fail.[13]

---

[13] The Defendant also asserts that Adenekan's complaint fails because the "unelaborated allegation" that Adenekan was fired from Lilly on December 9, 2007, does not satisfy Adenekan's burden under *Twombly* to set forth factual content that allows the court to draw the reasonable inference that Adenekan was discharged on account of his race. Given that the Court has held that Adenekan fails to make out a prima facie case of discriminatory discharge, it does not address this alternative argument. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 718 (7th Cir. 2011) (explaining that motions styled as Rule 12(b)(6) motions were in reality motions for judgment on the pleadings because the defendants had already filed answers); *S.E.C. v. Wolfson*, 539 F.3d 1249, 1264-65 (10th Cir. 2010) ("Although a motion for judgment on the pleadings can be filed at any time before trial, nothing in the language of the rule implies that the motion must be disposed of prior to other pending motions, including a motion for summary judgment.").

## IV. CONCLUSION

For the foregoing reasons, the Defendant's motion for summary judgment as to Adenekan's claim for hostile work environment is **DENIED**. The Defendant's motion for summary judgment as to Adenekan's claims for discriminatory pay, discipline, and discharge is **GRANTED**.

**SO ORDERED:** 06/15/2012

_William T Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.